The NATION MAGAZINE (a/k/a The Nation Company, Inc.), Harper's Magazine, In These Times (a/k/a The Institute for Public Affairs, Inc.), Pacific News Service (a/k/a Bay Area Institute, Inc.), The Guardian (a/k/a Institute for Independent Social Journalism, Inc.), The Progressive Magazine (a/k/a The Progressive, Inc.), Mother Jones Magazine (a/k/a Foundation for National Progress, Inc.), The L.A. Weekly (a/k/a Los Angeles Weekly, Inc.), The Village Voice (a/k/a VV Publishing Corporation), The Texas Observer (a/k/a The Texas Observer Publishing Company), Pacifica Radio News (a/k/a The Pacifica Foundation, Inc.) and Sydney H. Schanberg, E.L. Doctorow, William Styron, Michael Klare, and Scott Armstrong, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF DEFENSE, Richard Cheney, Secretary of Defense, Peter Williams, Assistant Secretary of Defense for Public Affairs, General Colin Powell, Chairman of the Joint Chiefs of Staff, George H. Bush, President of the United States and Commander-in-Chief of the Armed Forces of the United States of America, Defendants.

AGENCE FRANCE–PRESSE and Michael Sargent, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF DEFENSE, Richard Cheney, Pete Williams, Assistant Secretary of Defense for Public Affairs, General Colin Powell, Chairman of the Joint Chiefs of Staff, and George H. Bush, President of the United States and Commander-in-Chief of the Armed Forces of the United States, Defendants.

Nos. 91 Civ. 0238 (LBS), 91 Civ. 0910 (LBS).

United States District Court, S.D. New York.

April 16, 1991.
As Amended May 2, 1991.

---

**3.** *See also* Disputed Facts at 2–4 (offering no dispute).

Siegel, Deale, Stavis, Cole and Ratner, New York City (Franklin Siegel, Frank Deale, Morton Stavis, David Cole, Michael Ratner, of counsel), for Nation Magazine, et al.

Stuart M. Gerson, Asst. Atty. Gen. of the U.S. Civil Div., Dept. of Justice, Washington, D.C. (David J. Anderson, Director, Neil H. Koslowe, Sp. Litigation Counsel, Susan F. Cohen, of counsel), for defendants.

Goldfarb, Kaufman & O'Toole, Washington, D.C. (Joshua J. Kaufman, of counsel), for Agence France–Presse and Michael Sargent.

The Washington Legal Foundation, Washington, D.C. (Daniel J. Popeo, Paul D. Kamenar, Richard A. Samp, Gary M. Greenbaum, of counsel), American Civil Liberties Union, New York City (Steven R. Shapiro, of counsel), amicus curiae.

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City (Edward Copeland, Nicholas E. Poser, of counsel), amicus curiae, for Fairness & Accuracy in Reporting, Inc.

Brown & Bain, P.A., Tucson, Ariz. (Karen Krasnow Waterman, of counsel), amicus curiae, for Association of Alternative Newsweeklies (AAN) and Journalism Faculty Newsweeklies (Douglas A. Anderson, Ben H. Bagdikian, Todd Gitlin, Tom Goldstein, Bruce D. Itule, Carl Jensen, Michael Norman, Jonah Raskin, Robert Karl Manoff, David Protess, Edmund J. Rooney, Herbert I. Schiller, Mitchell Stephens, Steve Weinberg and Betty Houchin Winfield).

Washington Square Legal Services, Inc., New York City (Laura Sager, of counsel), amicus curiae, for Thirteen Members of Congress (Peter H. Kostmayer, Don Edwards, David E. Bonior, Jim McDermott, Louis Stokes, Lane Evans, Bruce F. Vento, Neil Abercrombie, Jolene Unsoeld, George Miller, Ronald V. Dellums, Barbara Boxer, and Wayne Owens).

## OPINION

SAND, District Judge.

## I. INTRODUCTION AND SUMMARY

This is an action by various members of the press challenging regulations promulgated by the United States Department of Defense ("DOD") to govern coverage of military activities of American armed forces overseas during periods of open hostilities. These regulations, adopted after the Vietnam War, were in effect in some form during the Grenada and Panama military operations. In revised form, they were in effect during American military operations Desert Shield (American military presence in the Persian Gulf) and Desert Storm (open hostilities). They were lifted on March 4, 1991, upon the informal cessation of hostilities in the Persian Gulf.

The NATION plaintiffs, in an action commenced on January 10, 1991, prior to the transition from Desert Shield to Desert Storm, have challenged these regulations

as being violative of the First and Fifth Amendments. While these regulations are challenged on various grounds, plaintiffs' fundamental claim is that the press has a First Amendment right to unlimited access to a foreign arena in which American military forces are engaged. Plaintiffs urge that the DOD "pooling" regulations, which limit access to the battlefield to a specified number of press representatives and subject them to certain restrictions, infringe on news gathering privileges accorded by the First Amendment. The primary focus of plaintiffs' challenge is on the question of access and not primarily on those restrictions which limit, for national security reasons, the information that pool members may publish.

DOD argues that the First Amendment does not bar the government from restricting access to combat activities and that the regulations are narrowly tailored and necessitated by compelling national security concerns. No party or amicus questions the applicability of the First Amendment to regulations imposed on American press representatives by the DOD governing actions overseas.

The issues raised by this challenge present profound and novel questions as to the existence and scope of a First Amendment right of access in the context of military operations and national security concerns. Those few precedents which have discussed First Amendment issues in the context of national security have been "prior restraint" cases. See Near v. Minnesota, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931) (prior restraint presumed unconstitutional, though "no one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops"); New York Times Co. v. United States, 403 U.S. 713, 726, 91 S.Ct. 2140, 2147, 29 L.Ed.2d 822 (1971) (the Pentagon Papers case). Cases addressing a right of access have arisen in the context of such fora as a courtroom, a prison, and a campaign headquarters. See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 564, 100 S.Ct. 2814, 2820, 65 L.Ed.2d 973 (1980)

(criminal proceedings in a courtroom); Pell v. Procunier, 417 U.S. 817, 819–21, 94 S.Ct. 2800, 2802–04, 41 L.Ed.2d 495 (1974) (interviewing prisoners); American Broadcasting Companies v. Cuomo, 570 F.2d 1080, 1083 (2d Cir.1977) (campaign activities). No previous cases deal on the merits with a right of access to a battlefield. The closest, but hardly controlling analogies, are those cases which have upheld the exclusion of the press and public from military bases. See, e.g., Greer v. Spock, 424 U.S. 828, 838–40, 96 S.Ct. 1211, 1217–18, 47 L.Ed.2d 505 (1976).

The basic question of access to the battlefield raised in this case is a significant matter of first impression. However, before a federal court may adjudicate an issue on the merits, various threshold questions must be resolved in plaintiffs' favor. Indeed, DOD asserts that for several reasons this Court should dismiss the complaint without reaching the merits. DOD's first contention is that plaintiffs have no standing to raise these issues since there has been no showing that they were in fact excluded from admission to any media pool. The Court finds this argument to be without merit. Whatever validity this claim may have had at the outset of this litigation was dissipated when, as discussed below, Agence France–Presse ("AFP") was in fact excluded from a pool and joined this suit.

The second ground on which DOD suggests this Court should decline to hear the merits of the controversy is the political question doctrine. DOD urges that the questions presented are non-justiciable because the United States Constitution designates the President as the Commander-in-Chief of the Armed Forces. For this reason, DOD claims that a federal court may not review determinations made by the Executive Branch in a military context, even when First Amendment rights are implicated. The Court rejects this contention for the reasons stated below.

Third, and most strenuously, DOD urges that once the regulations were lifted this controversy became moot and therefore non-justiciable. In resolving the question

of mootness, a court must answer two discrete questions. First, is there in fact an ongoing controversy? This may be found to exist if the challenged conduct is either continuing or is "capable of repetition, yet evading review." *Southern Pacific Terminal v. Interstate Commerce Com.*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). To meet the "capable of repetition, yet evading review" requirements, the court must find that the challenged action was too short in its duration to be fully litigated and that there is a "reasonable expectation" that the party bringing the suit will "be subjected to the same actions again." *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975). For the reasons discussed below, we conclude that this controversy survives a challenge of mootness on these grounds. However, this conclusion resolves only the first of the two mootness issues present in this case—namely, that the Court has jurisdiction and the power to determine the questions presented.

The second, more delicate and troublesome mootness inquiry is whether, in an action such as this, where plaintiffs seek both declarative and injunctive relief, the court should in its discretion exercise such power to adjudicate the merits of the dispute. For a number of reasons more fully stated below, we conclude that such power should not be exercised in this case. We base this conclusion primarily on the abstract nature of the important issues now before the Court. We conclude that this Court cannot now determine that some limitation on the number of journalists granted access to a battlefield in the *next* overseas military operation may not be a reasonable time, place, and manner restriction, valid under the First and Fifth Amendments. Since we find the issues as here presented to be too abstract and conjectural for judicial resolution the Court, on

this ground, grants DOD's motion to dismiss the complaint.

## II. PROCEDURAL HISTORY

As noted, the plaintiffs other than AFP (the "NATION plaintiffs"), commenced this action by the filing of a complaint on January 10, 1991 seeking declaratory and injunctive relief. No motion for preliminary injunctive relief accompanied that filing. On January 16, 1991, the NATION plaintiffs moved for expedited discovery seeking to depose Pete Williams, Assistant Secretary of Defense and the chief press spokesperson for the DOD. This motion was granted and a time was scheduled for the Williams deposition. On January 25, 1991, the NATION plaintiffs filed an amended complaint, still unaccompanied by any motion. Defendant moved to dismiss on February 1, 1991, on the grounds that the NATION plaintiffs lacked standing and the case was non-justiciable. Later in the week defendant sought a protective order with respect to the Williams deposition. The application for a protective order was withdrawn after the parties agreed to the use of interrogatories as a substitute for the requested deposition.[1]

On February 6, 1991, AFP, a wire service with reporters and photographers in the Persian Gulf, filed an action related to this case, seeking a temporary restraining order. AFP asserted that the DOD regulations, which excluded them from certain media pools, violated the First Amendment on their face and as applied. AFP asserted three claims. First, that the DOD requirement that priority be given for entry into the American pools to press representatives who "principally serve the American public" is constitutionally infirm. In the alternative, AFP argued that by serving 24 million readers in the United States, it satisfied the "principally serve the American public" requirement. *See* transcript, Feb-

---

1. In initially granting plaintiffs' motion for expedited discovery, the Court raised *sua sponte* the inherent conflict between the obviously urgent non-litigation demands on Williams' time and energies and the spectre of mootness which even then hovered over the case in light of the Panama and Grenada experience, as discussed

in *Flynt v. Weinberger*, 762 F.2d 134, 135 (D.C. Cir.1985). The proposals that some surrogate of Williams be deposed or that a more expedited timetable be adopted for briefing and arguing the anticipated motions were rejected by the parties. *See* transcript, January 28, 1991, at p. 5, 11, 17, 18.

ruary 14, 1991, at p. 5. Second, AFP claimed that the DOD practice of permitting the selection process for admission to pools to be coordinated by AFP's principal competitor, Reuters Information Services Inc., was unfair and illegal. Finally, AFP asserted that it was the only major wire news service excluded from the pool, in violation of its rights under the Fifth Amendment.

On February 14, 1991, oral argument was heard on AFP's application for a temporary restraining order and on DOD's motion to dismiss the AFP action. At oral argument, AFP supplemented the motion with an oral application for interim relief, requesting that the photos produced by pool members be made available to AFP until the Court ruled on its application for a temporary restraining order and DOD's motion to dismiss. Decision was reserved pending further submissions on this and other questions. In a supplemental submission by DOD new issues were raised, including the alleged exclusion by the French government of foreign press representatives from the military sectors in the Persian Gulf controlled by the French.

On February 20, 1991, the plaintiffs in the NATION action filed a motion requesting a preliminary injunction. On February 25, 1991, prior to any decision in the AFP case and prior to oral argument on the motions in the NATION action, DOD moved to join the cases. The parties, by stipulation, agreed to consolidate under Fed.R.Civ.P. 42 those claims in the actions which were identical. The "separate and distinct issues [which] relate to the application and constitutionality of Department of Defense policies and guidelines as applied to Agence France–Presse" were to be resolved by the Court independently. DOD withdrew its motion for joinder and the plaintiffs withdrew their opposition.

Oral argument was heard on the consolidated NATION–AFP case on March 7, 1991.[2] At oral argument, AFP withdrew its request for interim relief and a temporary restraining order on the ground that these requests were moot as a result of the lifting of the press regulations, which occurred on March 4, 1991. The case is presently before the Court on the AFP and the NATION motions for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a), both plaintiffs' request for declaratory relief, and the government's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6).

### III. BACKGROUND OF REGULATIONS

During the Vietnam War the press was granted virtually unlimited access to the areas surrounding military operations. Access to observe events in actual battles was at the discretion of the field commanders, though only in rare instances was it denied. This unwritten policy of access to military activities enabled American audiences to observe events daily, including casualties and deaths in vivid and often painful detail. The only official restrictions by DOD during the Vietnam War were guidelines that limited dissemination of specific kinds of combat information that military officials concluded compromised the national security of this country. In contrast, when the United States invaded Panama and Grenada, DOD placed significant restraints on media coverage, particularly in terms of access for newsgathering purposes.[3]

When the United States sent troops to the Middle East in the fall of 1990, DOD issued regulations to restrict press access

---

**2.** A number of organizations moved for leave to file briefs as *amicus curiae.* The Court granted all such motions without opposition. The American Civil Liberties Union submitted a brief in support of plaintiffs' claims on behalf of the New York Civil Liberties Union, Fund for Free Expression, Committee to Protect Journalists, Pen American Center and Pen Center USA West. Other amici who submitted briefs supporting the plaintiffs include the Association of Alternative Newsweeklies, Journalism Faculty and Fairness, Accuracy in Reporting, Inc. and thirteen members of Congress. In support of the position taken by DOD, the Washington Legal Foundation submitted an *amicus* brief.

**3.** A full description of this background can be found in the Sidle Report. *See* Chairman of the Joint Chiefs of Staff Media Military Relations Panel, Final Report (August 23, 1984). *See also* Department of Defense Review of Panama Pool Deployment (March, 1990) ("Hoffman Report").

and coverage of events occurring in the Persian Gulf before and during Operation Desert Storm. The regulations subsequently were revised a number of times.[4] The latest DOD directive, dated January 30, 1991, for use "during the initial stages of U.S. military activity in the Arabian Gulf area," is entitled CENTCOM POOL MEMBERSHIP AND OPERATING PROCEDURES ("CENTCOM").[5] The CENTCOM rules, among other things, created press "pools" to provide coverage of the war. DOD claims that the primary purpose of press pools in a military operation is to develop "a cooperative arrangement designed to balance the media's desire for unilateral coverage [6] with ... CENTCOM's responsibility to maintain operational security, protect the safety of the troops, and prevent interference with military operations." CENTCOM at 1. According to DOD, the pools in this instance, and any imposed in the future, are temporary, with the aim being "to permit unilateral media coverage of combat and combat-related activity as soon as possible." *Id.*

Competition for admission into CENTCOM pools was intense. DOD set criteria for participation in the pools since the number of media representatives allegedly had to be limited "[d]ue to logistics and space." *Id.* Under the CENTCOM operating procedures, preference was given to "media that principally serve the American public and that have a long-term presence covering Department of Defense military opera-

tions." *Id.* For press representatives that did not meet this criteria, DOD created pool positions designated as "Saudi" and "International." Competition to gain access to these pools was less severe. The pools were divided into media categories, including television, radio, wire service, news magazine, newspaper, pencil, and photo. The "International" and "Saudi" pools did not make distinctions on the basis of media category.

Membership in the various pools was by organization rather than by individual press representative. Each of the pools was required to appoint a pool coordinator who "serve[d] as the spokesperson and single point of contact for that medium." *Id.* In the event of conflicts, according to the CENTCOM regulations, "any disputes about membership in or operation of the pool shall be resolved by the pool coordinator." *Id.* Participants were required to share all media products within their medium to pool members, but were not required by the regulations to distribute information to non-pool media representatives.

Membership in one of the pools was essential to obtaining access to information involving United States and Allied Forces in the Persian Gulf. During United States combat activities, the only news media authorized to enter forward areas were the pool participants, according to DOD's "Guidelines for News Media" dated January 14, 1991 ("Guidelines").[7] Membership

---

**4.** The first set of press regulations was issued on January 7, 1991 (*see* Appendix A). Revised versions were issued on January 10, 1991 (*see* Appendix B) and January 14, 1991 (*see* Appendix C). The latest versions were issued on January 30, 1991 (*see* Appendix D). The "ground rules" (*see Appendix E*), which were a separate portion of the DOD regulations, are not included in the definition of "press regulations" and are not challenged in this action. *See* transcript, March 7, 1991, at p. 18. In fact, it is a version of the ground rules as presently written that were utilized during the Vietnam conflict, which the plaintiffs suggest should be the only restriction on the press in war time. *See id.* at p. 18.

**5.** The regulations by their terms relate only to the "initial stages" of a military operation. DOD used the term "initial" numerous times in its brief and alluded to the fact that a basis for surviving a First Amendment challenge is the

limited amount of time for which the restrictions would apply. *See* Defendant's Memorandum of Law at p. 7. Yet, the record discloses the difficulty in defining this term, causing this Court to inquire of the defendants when, after the ground war was well under way, such initial stage would be deemed to be over. In fact, the regulations were not lifted until March 4, 1991. *See* transcript, March 7, 1991, at pp. 8–10.

**6.** "Unilateral coverage" is the term utilized as an antonym to "pool coverage." Under unilateral coverage there are few if any restrictions on "access" to the battle arena.

**7.** On January 10, 1991, Mr. Williams, speaking at a DOD press briefing, stated that an order had been issued to detain reporters who appeared unescorted on the battlefield with one of the forward units, remove them to the rear, and send them to Dhahran as soon as possible. *See*

in the pools did not, however, entitle press representatives to observe freely all military activities. Rather, the military determined where pool members would be able to travel and journalists had to remain with their escorts at all times. Additionally, not all pool members participated in each expedition to the forward lines. Under the CENTCOM regulations, membership in the standing pools rotated every two or three weeks as the situation permitted. *See* CENTCOM at 2. In other words, members of the pools took turns gathering news, allegedly due to logistical limitations.

The news gathered in the field by pool participants was subject to review by a DOD public affairs officer before release. According to the "Operation Desert Shield Ground Rules," dated January 14, 1991 ("Ground Rules"), the security reviews were "to determine if [news reports] contain information that would jeopardize an operation or the security of U.S. or coalition troops." Ground Rules at 1. The types of information that the military considers sensitive are outlined in the Ground Rules. *Id.* The Guidelines state that "[m]aterials will be examined solely for ... conformance to the ... [G]round Rules, not for their potential to express criticism or cause embarrassment."

In the event there was a lack of agreement between the media representative and the public affairs officer about the sensitive nature of particular news gathered, the disputed information was sent to the Joint Information Bureau ("JIB") in Dhahran. If consensus was not reached after a meeting with the JIB Director, the issue was forwarded to the Office of the Assistant Secretary of Defense (Public Affairs) for review with the appropriate bureau chief. *See* Guidelines at 1. According to the Guidelines, the "ultimate decision on publication will be made by the originating reporter's news organization." *Id.*

In Defendant's Second Supplemental Memorandum, DOD reported that as of March 4, 1991, CENTCOM had announced that open, unilateral media coverage of Operation Desert Storm was in place in all theatres of operation. At oral argument on March 7, 1991, DOD clarified that the CENTCOM rules and regulations were no longer being enforced and that the pools had been deactivated. On the other hand, when asked, the government reported that the rules had not been abrogated. Defendant suggested that in this case, as in all recent past military operations, *i.e.,* Panama and Grenada, DOD reviews procedures involving the press and aims to make recommendations for future revisions and improvements.

## IV. DISCUSSION

As briefly summarized above, plaintiffs must satisfy a number of threshold justiciability requirements. The first issue is whether plaintiffs have standing to ask the Court to address the violations they allege. If plaintiffs prevail on the standing question, the next inquiry is whether the nature of the alleged violations are political questions and beyond the competence of this Court. If there is no bar from either of these doctrines, the question remains whether this controversy is moot due to the lifting of the CENTCOM pools and regulations. In the event the Court determines that at least some of the issues are not moot and that there is jurisdiction to hear the claims, a question remains whether the Court should exercise its power to address the controversy.

### A. *Standing*

The doctrine of standing is rooted in Article III of the United States Constitution, which limits federal courts to adjudicating actual "cases and controversies." *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). If a plaintiff fails to establish that an action presents an actual case or controversy capable of judicial resolution, a court lacks subject matter jurisdiction. *See Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 476, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982). For a plaintiff to have

DOD News Briefing Transcript, January 10, 1991, by Mr. Pete Williams, at p. 2.

standing to raise constitutional claims, he must show he has suffered an actual or threatened injury which is fairly traceable to the defendant's conduct and which is likely to be redressed by a favorable decision. *See id.* at 472, 102 S.Ct. at 758. In deciding questions of standing in constitutional cases, courts should also consider whether there are any prudential concerns that militate against granting standing to the plaintiff. *See id.* at 474, 102 S.Ct. at 759.

This Court has no difficulty in concluding that the harms alleged by plaintiffs in this case are "distinct and palpable." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Plaintiffs have alleged, in both their access and discrimination claims, injury to interests which lie at the core of the First and Fifth Amendments. In the event there is any question as to whether the NATION plaintiffs have standing, the consolidation of the case with the AFP plaintiffs definitively resolves the dispute.[8] There is no question of fact that AFP was denied access to CENTCOM pools and that the two complaints contain the same constitutional challenges to the pooling regulations. Therefore, it is clear that the issues raised in both the complaints are brought before the Court by parties who have allegedly suffered immediate injury resulting from the challenged regulations. Moreover, the prudential limitations on the granting of standing—such as the prohibition against raising generalized grievances or the raising of third party rights—are not implicated in this case. Accordingly, this Court concludes that plaintiffs have standing to raise their First and Fifth Amendment claims.

### B. *Political Question Doctrine*

■ A second theory of non-justiciability raised by the defendant and expanded upon by one *amicus*[9] is the political question doctrine. The political question doctrine is based on separation of powers concerns and may arise in a variety of contexts. *See Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962). As summarized by Justice Powell, the doctrine essentially encompasses three inquiries:

> (i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?

*Goldwater v. Carter,* 444 U.S. 996, 998, 100 S.Ct. 533, 534, 62 L.Ed.2d 428 (1979) (Powell, J., concurring). In pursuing these inquiries, the Supreme Court has warned that courts must not reject as "no lawsuit" a bona fide controversy as to whether a concededly "political" action exceeds constitutional authority. *See Japan Whaling Assoc. v. American Cetacean Soc.,* 478 U.S. 221, 229, 106 S.Ct. 2860, 2865, 92 L.Ed.2d 166 (1986). If a litigant invokes a constitutional provision that can be successfully translated into judicially enforceable rights, the case cannot be held non-justiciable on political question grounds. *See Baker,* 369 U.S. at 211, 82 S.Ct. at 706.

In this case, the question is whether any constitutional right asserted by the plaintiffs involves the activities of the United States military, and if so, whether this Court's review of the claim on the merits would conflict with separation of powers principles, which assign this country's military matters to the legislative and executive branches of government. There is a long line of cases addressing the role of the judiciary in reviewing military decisions made by the Executive Branch pursuant to its Article II powers under the Constitution. The message is clear. Civilian courts should "hesitate long before entertaining a

---

8. The government argues with respect to plaintiffs' Fifth Amendment claims that plaintiffs' allegations of harm are too vague because plaintiffs do not allege that they were denied entry into the CENTCOM pools, denied visas for entry into Saudi Arabia, or the like. This Court believes that plaintiffs' allegations that defendants have treated them in a discriminatory fashion by giving preferential access to other media organizations suffice to establish the injury element of the standing requirement.

9. *See* Amicus Brief of Washington Legal Foundation, pp. 15–21.

suit which asks the court to tamper with the ... necessarily unique structure of the Military Establishment." *Chappell v. Wallace,* 462 U.S. 296, 300, 103 S.Ct. 2362, 2366, 76 L.Ed.2d 586 (1983).

In cases evaluating whether the political question doctrine bars review of military decisions, the Supreme Court has almost always declined to reach the merits of these cases. Yet, each of the cases involved direct challenges to the institutional functioning of the military in such areas as the relationship between personnel, discipline, and training. *See id.* at 300, 103 S.Ct. at 2365 (political question doctrine barred Article III courts from entertaining a suit to recover damages by enlisted military personnel against a superior officer for alleged constitutional violations since the special nature of the military requires two systems of justice); *Parker v. Levy,* 417 U.S. 733, 749–56, 94 S.Ct. 2547, 2558–61, 41 L.Ed.2d 439 (1974) (political question doctrine barred court consideration of legality of more encompassing regulations defining criminal conduct and restricting First Amendment rights in the military); *Gilligan v. Morgan,* 413 U.S. 1, 5–12, 93 S.Ct. 2440, 2443–47, 37 L.Ed.2d 407 (1973) (political question doctrine barred review where granting remedy would require review and continuing surveillance of training of National Guard); *Orloff v. Willoughby,* 345 U.S. 83, 90, 73 S.Ct. 534, 538, 97 L.Ed. 842 (1953) (commissioning of officers in Army is matter of discretion within the province of the President over which the courts have no control). None of these cases, however, are dispositive of the questions presented in the instant action.

In this case, there is no challenge to this country's military establishment, its goals, directives or tactics. As such, the President's Article II powers as Commander-in-Chief are not implicated because resolution of the question does not impact upon the internal functioning and operation of the military. Certainly this court would have neither the power nor the inclination to review a military determination that the presence of a large cadre of press representatives at a particular time and place would jeopardize the covert nature of a military operation. This might occur, for example, if all of the press corps suddenly left one area where amphibious landings were being practiced to deceive the enemy and moved to another area where a flanking ground action was poised to take the enemy by surprise. But here the press is not challenging exclusion from covert operations. Rather, it claims that the regulations do not represent a fact-specific tactical or strategic decision, but rather are "blanket" regulations which apply with equal force to access to battlefields where overt actions are in progress.

Accordingly, this Court concludes that the question of what restrictions may be placed on press access to combat zones is not "committed by the text of the Constitution to a coordinate branch of government." *Goldwater,* 444 U.S. at 998, 100 S.Ct. at 534. Nor does the question impact upon the foreign relations power by interfering with United States relations with a foreign sovereign, such as Saudi Arabia. The two central issues in this case—press access and inequality of treatment of different press organizations—relate primarily to CENTCOM management of the United States press covering United States military operations and have only an incidental relationship to American policy towards Saudi Arabia or other nations.

Furthermore, it cannot be said that plaintiffs have failed to allege a judicially enforceable right, or that enforcement of the rights raised by plaintiffs would require this Court to move beyond areas of traditional judicial expertise. The historic competence of the federal judiciary to address questions of First Amendment freedoms and equal protection is clear. *See Baker,* 369 U.S. at 226, 82 S.Ct. at 714. What is alleged by members of the press is the violation by the United States government of a judicially enforceable right under the First and Fifth Amendments. Plaintiffs seek to be freed from government interference in gathering and reporting news involving events that occur during an overt military operation, such as that in the Persian Gulf.

The Court concludes that plaintiffs' complaint alleges claims that are judicially enforceable under the First and Fifth Amendments. We find unpersuasive DOD's primary argument that the political question doctrine bars an Article III court from adjudicating any claims that involve the United States military. Under this theory of separation of powers, a court would lack jurisdiction to hear any controversy that involved DOD, including any government actions that violated the rights of non-military personnel. This reasoning is inconsistent with large bodies of constitutional law. For example, there could be little argument that a court would have the power to invalidate a constitutionally infirm regulation which explicitly made admission to a press pool dependent on the political content of a journalist's prior writings or which imposed racial or religious criteria for admission. The Court concludes that the mere fact that the regulations were promulgated by DOD to deal with press restrictions during military operations does not render the controversy non-justiciable.

### C. *Mootness*

■ The most difficult of the justiciability questions raised in this action is whether the case may survive a mootness challenge. Defendant has the burden of proving that a case has become moot by virtue of events subsequent to the filing of the complaint. DOD urges that this has occurred. DOD, furthermore, claims that none of the well recognized exceptions to the mootness doctrine are applicable in this case. Finally, defendant suggests that even if the Court determines that the case is not moot, plaintiffs' request for equitable relief in the form of a declaratory judgment, which is at all times a matter within the Court's discretion, should be denied since the claims are not presented in a concrete and focused manner. For reasons that require some exposition, we conclude, based on all the circumstances of the case, that this controversy is not now sufficiently concrete and focused to permit adjudication on the merits.

Generally, a case becomes moot when the issues "presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt,* 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982). In other words, a case fails to meet Article III case and controversy requirements and to satisfy related prudential concerns when the passage of time has caused it to lose "its character as a ... controversy of the kind that must exist if [the Court is] to avoid advisory opinions on abstract propositions of law." *Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 201–02, 24 L.Ed.2d 214 (1969) (per curiam); *see also S.E.C. v. Medical Comm. for Human Rights,* 404 U.S. 403, 407, 92 S.Ct. 577, 579, 30 L.Ed.2d 560 (1972); Monaghan, "Constitutional Adjudication: The Who and When," 82 Yale L.J. 1363, 1384 (1973). To determine whether mootness exists, a court must examine each issue in the case separately. Even when "one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy." *Powell v. McCormack,* 395 U.S. 486, 497, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969).

A number of exceptions to the mootness doctrine have developed. In this case, the exception most likely to be applicable is that originally articulated in *Southern Pacific Terminal Co.,* 219 U.S. at 515, 31 S.Ct. at 283, where the Supreme Court held that an issue is not moot if it is "capable of repetition, yet evading review." *Id.* The capable of repetition, yet evading review doctrine applies where two elements are present. First, the challenged action must have been too short in duration to be fully litigated prior to its cessation or expiration. Second, there must be a "reasonable expectation" that the party bringing the action would be "subjected to the same action again." *Weinstein,* 423 U.S. at 149, 96 S.Ct. at 349 (1975); *see also Super Tire Eng'g Co. v. McCorkle,* 416 U.S. 115, 126, 94 S.Ct. 1694, 1700, 40 L.Ed.2d 1 (1974).[10]

---

10. An alternative basis for holding that a case is not moot is the doctrine of voluntary cessation. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v.*

The question for this Court is whether any of plaintiffs' outstanding claims survive under the capable of repetition, yet evading review test. The war in the Persian Gulf, like many recent military conflicts involving the United States, was short and swift. Even with efforts by all parties, the judicial process often will not be able to resolve legal controversies such as this before hostilities have ceased. *See Flynt*, 762 F.2d at 135. As such, this Court concludes that the controversy engendered by the CENTCOM regulations did not "last long enough for complete judicial review." *Super Tire*, 416 U.S. at 126, 94 S.Ct. at 1700. Because of the speed with which recent wars have terminated, as is clearly documented by the sequence of events in Panama and Grenada, the evading review test outlined in *Weinstein*, 423 U.S. at 149, 96 S.Ct. at 348, is satisfied.

The more difficult question is whether there is a reasonable expectation that the "same parties" will be "litigating the same issues" when the United States next engages in a military operation overseas. DOD has admitted that the CENTCOM regulations have been "lifted" but remain in place and may be reactivated. In fact, during the last three military efforts of the United States abroad, various types of pooling arrangements were utilized and the government concedes it is likely to follow this format in the future. *See* Defendant's Reply Memorandum, p. 7. Given these facts, it is not unreasonable to suppose that in future military activities DOD will behave in a manner that is susceptible to the same challenges as those raised in this complaint. Furthermore, it takes little imagination to assume that the NATION and AFP, both of which have a long history of covering wartime stories, will be seeking to report the news during the next conflict.

There is, however, a caveat. No two sets of pooling regulations will be identical nor will their application be the same since the nature of modern warfare is such that each

conflict is different. DOD has asserted that its press regulations are under review now, as they were after Panama and Grenada, and that revisions will reflect, to the extent DOD deems appropriate, suggestions made by the press. Thus, the possibility exists that precise repetition may not occur. But in mootness cases where the doctrine that a challenged practice is capable of repetition is involved, some repetition may always be avoided by revision of the challenged conduct. This should not be deemed to defeat the application of the doctrine where there is no assurance as to when, if, and how the challenged practice will in fact be revised. Furthermore, while the exact language of the regulations may change, the nature of the conflict will most likely remain the same in a future action until the issues are definitively decided by the parties or the judiciary.

Although the Court concludes that as a general matter the capable of repetition test is applicable to this action and the Court has the power to hear the case on the merits, the question remains which, if any, of plaintiffs' claims are eligible for the relief sought. We proceed now to examine the specific claims.

### 1. Claims for Injunctive Relief

█ Plaintiffs seek to enjoin DOD from using pools that exclude some members of the press and from applying unfairly the regulations in effect when the complaint was filed. To obtain an injunction, plaintiffs must show a threat of imminent, specific and irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974). As one Court wrote in addressing the relationship between mootness and injunctive relief, "past injury alone is not sufficient to merit the award of relief against future conduct." *Halkin v. Helms*, 690 F.2d 977, 1005 (D.C. Cir.1982); *see also Super Tire*, 416 U.S. at 121, 94 S.Ct. at 1697.

*Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982). This doctrine is generally operative when a defendant elects to cease a challenged activity for purposes related to the litigation and not be-

cause the circumstances which motivated the challenged conduct have changed. Here, the cessation of hostilities was a circumstance independent of this suit.

Plaintiffs' claims for injunctive relief cannot survive a motion to dismiss on the ground of mootness. AFP's request for interim relief, as well as for a temporary restraining order, and the NATION plaintiffs' motion for a preliminary injunction, are without doubt moot. Since the regulations have been lifted and the press is no longer constrained from travelling throughout the Middle East, there is no longer any presently operative practice for this Court to enjoin. Furthermore, there is no threat of irreparable harm since AFP and the NATION plaintiffs are able to gather and report news freely. Since injunctive relief is not appropriate for past injuries, this Court holds that all of plaintiffs' claims requesting injunctive relief are moot.

### 2. Claims for Declaratory Relief

■ Even though the case for injunctive relief dissolved with the end of the war and the lifting of the CENTCOM regulations, plaintiffs may still retain sufficient interests and injury to justify declaratory relief on their general right of access and equal access claims.[11] The request, however, must not be for an advisory opinion since a federal court lacks the power to "decide questions that cannot affect the rights of the litigants in the case before them." *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). In the context of mootness, the question is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941); *see also Super Tire*, 416 U.S. at 122, 94 S.Ct. at 1698 (action not mooted by short labor strike and declaratory relief appropriate when plaintiffs are "adversely affected by the government without a chance of redress."); *Penguin Books USA Inc. v. Walsh*, 929 F.2d 69 (2d Cir.1991).

There is some precedent for determining the appropriateness of declaratory judgments in the context of military operations that have terminated. In a case involving press coverage of the United States military activities in Grenada, the D.C. Circuit held that, at the time of judicial review, the action was moot "because appellants' complaint seeks a declaratory judgment *solely* with respect to the constitutionality of the press ban *in Grenada*." *Flynt*, 762 F.2d at 135 (emphasis added). The court's reasoning suggested, however, that declaratory relief might have been appropriate if the complaint had alleged constitutional violations more broadly and had otherwise met the capable of repetition yet evading review requirements. *Id.*

Within the boundaries of these principles and the mootness doctrine, this Court must determine whether it has the power to address plaintiffs' request for a declaratory judgment on the issues remaining in the case. The complaint alleges that the unconstitutional practices of the DOD have been in place since 1983 and have continued through the operations in the Persian Gulf. Plaintiffs specifically challenge DOD's use of media pools as an unconstitutional means of denying the press access to military activities. Further, plaintiffs suggest that the pool regulations provide preferential access and disparate treatment to reporters. Since the claims are broad and since DOD has lifted but not abrogated the regulations, this Court holds that the action is capable of repetition and eligible for declaratory relief.

The question of the court's power to hear a case is, however, only the beginning of the inquiry. A separate and more difficult inquiry is whether it is appropriate for a Court to exercise that power. *See Kremens v. Bartley*, 431 U.S. 119, 134 n. 15, 97 S.Ct. 1709, 1717 n. 15, 52 L.Ed.2d 184 (1977). The availability of thoroughly prepared briefs arguing both sides of a constitutional question and of numerous *amici curiae* offering to assist in the decisional process is not determinative, even though

---

**11.** Only the portion of these claims constituting "facial challenges" are eligible for declaratory relief. Any claims regarding the "as applied" aspects of these issues are moot.

all of them "stand like greyhounds in the slips, straining upon the start." *Id.* As the Supreme Court wrote on the question of exercising discretion, "jurisdiction ... should be exerted only when the jurisdictional question presented by the proceeding ... tenders the underlying constitutional issues in clean-cut and concrete form ..." *Rescue Army v. Municipal Court of Los Angeles,* 331 U.S. 549, 584, 67 S.Ct. 1409, 1427, 91 L.Ed. 1666 (1947).

At issue in this action are important First Amendment principles and the countervailing national security interests of this country. This case presents a novel question since the right of the American public to be informed about the functioning of government and the need to limit information availability for reasons of national security both have a secure place in this country's constitutional history. In short, this case involves the adjudication of important constitutional principles. The question, however, is not only which principles apply and the weighing of the principles, but also when and in what circumstances it is best to consider the questions. In determining whether to exercise its power to hear plaintiffs' claims for declaratory relief, the Court must evaluate each of the underlying claims in the context of existing First and Fifth Amendment doctrine to consider if the issues, at this time, are presented in a "clean-cut and concrete form." *Rescue Army,* 331 U.S. at 584, 67 S.Ct. at 1427.

a. *Right of Access*

■ The gravamen of plaintiffs' complaint is that, under the First Amendment, the press has a right to gather and report news that involves United States military operations and that DOD's pool regulations are an unconstitutional limitation on access to observe events as they occur. Plaintiffs suggest that this action does not seek to establish a new right or open new constitutional frontiers since no access is sought

that involves military plans, secrets, operational information or strategic sessions. In other words, plaintiffs claim that no affirmative assistance from the government is being requested, only the freedom from interference to report on what is overtly happening in an allegedly open area. Contrary to what plaintiffs suggest, this Court finds the question to be one of first impression, the answer to which would require charting new constitutional territory.

The Supreme Court has on a number of occasions considered the relationship between the First Amendment and national security. *See Near,* 283 U.S. at 716, 51 S.Ct. at 631; *New York Times Co.,* 403 U.S. at 722–23, 91 S.Ct. at 2145–46; *Snepp v. United States,* 444 U.S. 507, 514–15, 100 S.Ct. 763, 768, 62 L.Ed.2d 704 (1980). None of these cases, however, has addressed directly the role and limits of news gathering under the First Amendment in a military context abroad.[12] Nonetheless, there is no dearth of case law on questions involving the access rights of the press and public in other circumstances. As in most cases involving novel issues, the Court must reason by analogy. It is certain that there is no right of access of the press to fora which have traditionally been characterized as private or closed to the public, such as meetings involving the internal discussions of government officials. *See United States v. Nixon,* 418 U.S. 683, 705 n. 15, 94 S.Ct. 3090, 3106 n. 15, 41 L.Ed.2d 1039 (1974). Limitations may also be placed on access to government controlled institutions, such as prisons and military bases. *See Houchins v. KQED, Inc.,* 438 U.S. 1, 16, 98 S.Ct. 2588, 2597, 57 L.Ed.2d 553 (1978); *Greer,* 424 U.S. at 838, 96 S.Ct. at 1217; *Saxbe v. Washington Post Company,* 417 U.S. 843, 850, 94 S.Ct. 2811, 2815, 41 L.Ed.2d 514 (1974); *Pell v. Procunier,* 417 U.S. 817, 828, 94 S.Ct. 2800, 2807, 41 L.Ed.2d 495 (1974).

---

**12.** The United States Senate responded to the blackout and use of pools in Grenada by passing a resolution which stated, in part, the "since a free press is an essential feature of our democratic system of government and since currently in Lebanon, and traditionally in the past, the United States has allowed the press to cover conflicts involving United States armed forces, restrictions imposed upon the press in Grenada shall cease." 129 *Cong.Rec.* S14957 (daily ed. Oct. 29, 1983).

On the other hand, there is an almost absolute right of access to open places, including such fora as streets and parks. *See Hague v. C.I.O.*, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939). In recent times the Supreme Court has been particularly generous in interpreting the scope of the public's right under the First Amendment to know about government functioning, at least in such fora as a criminal trial. *See Richmond Newspapers, Inc.*, 448 U.S. at 564, 100 S.Ct. at 2820. In these cases, there appears to be some indication that the basis for such a right of access could apply more broadly. *See Globe Newspaper Co. v. Superior Court for County of Norfolk*, 457 U.S. 596, 606, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982).

A fundamental theme in *Richmond* and *Globe* was the importance of an informed American citizenry. As the Court wrote, guaranteed access of the public to occurrences in a courtroom during a criminal trial assures "freedom of communication on matters relating to the functioning of government." *Richmond Newspapers*, 448 U.S. at 575, 100 S.Ct. at 2826. Learning about, criticizing and evaluating government, the Supreme Court has reasoned, requires some "right to receive" information and ideas. *Martin v. City of Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313 (1943). In *Globe*, the Court devoted extensive attention to the importance of this "checking function" against abuse of government power. See Blasi, "The Checking Value in First Amendment Theory," 1977 Am.B.Found. Research J. 521, 593. This theme has been echoed by the Supreme Court even when the government has suggested that national security concerns were implicated. *See New York Times Co.*, 403 U.S. at 728, 91 S.Ct. at 2148 (Stewart, J. concurring) (" . . . [w]ithout an informed and free press, there can not be an enlightened people.")

Given the broad grounds invoked in these holdings, the affirmative right to gather news, ideas and information is certainly strengthened by these cases. By protecting the press, the flow of information to the public is preserved. As the Supreme Court has observed, "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First National Bank v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978). Viewing these cases collectively, it is arguable that generally there is at least some minimal constitutional right to access. *See Branzburg v. Hayes*, 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972) ("without some protection for seeking out the news, freedom of the press could be eviscerated.")

If the reasoning of these recent access cases were followed in a military context, there is support for the proposition that the press has at least some minimal right of access to view and report about major events that affect the functioning of government, including, for example, an overt combat operation. As such, the government could not wholly exclude the press from a land area where a war is occurring that involves this country. But this conclusion is far from certain since military operations are not closely akin to a building such as a prison, nor to a park or a courtroom.

In order to decide this case on the merits, it would be necessary to define the outer constitutional boundaries of access. Pursuant to long-settled policy in the disposition of constitutional questions, courts should refrain from deciding issues presented in a highly abstract form, especially in instances where the Supreme Court has not articulated guiding standards. *See Rescue Army*, 331 U.S. at 575–85, 67 S.Ct. at 1423–28. Since the principles at stake are important and require a delicate balancing, prudence dictates that we leave the definition of the exact parameters of press access to military operations abroad for a later date when a full record is available, in the unfortunate event that there is another military operation. Accordingly, the Court declines to exercise its power to grant plaintiffs' request for declaratory relief on their right of access claim.

### b. *Pooling as an Access Limitation*

■ The second claim which this Court must determine whether it will decide on the merits involves the question of limitations on access. Plaintiffs suggest that the government gave some members of the press preferential treatment in the form of financial assistance and more extensive access to events as they occurred. Again, the Court is being asked to provide declaratory relief that a set of regulations, though lifted, are unconstitutional on their face.[13] It is questionable whether any inquiry would be sufficiently focused to pass muster under *Rescue Army. Id.* A brief discussion of the underlying law is useful to identify the difficulty facing this Court were it to decide this portion of the case on the merits.

In the instant case, the government chose to grant some access to the press for purposes of covering military activities in the Persian Gulf. By opening the door, albeit in a limited manner, the government created a place for expressive activity. Establishing pools for coverage of the "initial stages" of the Persian Gulf conflict, the government, in essence, determined that the war theatre was a limited public forum. *See Perry Education Ass'n v. Perry Local Educators' Assn.,* 460 U.S. 37, 48, 103 S.Ct. 948, 956, 74 L.Ed.2d 794 (1983). Regardless of whether the government is constitutionally required to open the battlefield to the press as representatives of the public, a question that this Court has declined to decide, once the government does so it is bound to do so in a non-discriminatory manner. *See Houchins,* 438 U.S. at 16, 98 S.Ct. at 2597; *American Broadcasting Co., Inc. v. Cuomo,* 570 F.2d 1080 at 1083 (2nd Cir. 1977).

Once a limited public forum has been created, the government is under an obligation to insure that "access not be denied arbitrarily or for less than compelling reasons." *Sherrill v. Knight,* 569 F.2d 124, 129 (D.C.Cir.1977); *see also Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448 (1975). Restrictions on newsgathering must generally be no more "arduous than necessary, and ... individual news[persons] may not be arbitrarily excluded from sources of information." *Sherrill,* 569 F.2d at 130; *see also Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 491–92, 95 S.Ct. 1029, 1044–45, 43 L.Ed.2d 328 (1975); *United States v. Associated Press,* 52 F.Supp. 362, 372 (S.D.N.Y.1943).

The seminal case suggesting the analysis by which to determine whether regulations are discriminatory is *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972).[14] Above "all else," the Court wrote, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content." *Id.* The *Mosley* Court invalidated a Chicago ordinance which barred picketing within 150 feet of a school but exempted "peaceful picketing of any school involved in a labor dispute." *Id.* at 93, 92 S.Ct. at 2288. Once a forum is opened to assembly, speaking or observation by some groups, the government may not limit access to others who may express controversial or less favored views. *Id.* at 96, 92 S.Ct. at 2290. Furthermore, the government "may not select which issues are worth discussing or debating." *Id.* There is, the Court wrote, "an equality of status in the field of ideas" and the government must afford all points of view an equal opportunity to be heard. *Id.*

In focusing on the equality of all points of view, the *Mosley* Court was not con-

---

**13.** Plaintiffs suggest that the criteria for exclusion in the pools, including particularly the requirement that the press organization "have had a long-term presence covering Department of Defense military operations," is an unconstitutional condition.

**14.** A number of cases have relied explicitly on the Equal Protection Clause as well as the First Amendment. *See Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); *Erzonznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Mosley,* 408 U.S. at 92, 92 S.Ct. at 2286. In other cases, however, the Supreme Court has shown some reluctance to rely heavily on the Equal Protection Clause, concluding that the degree of scrutiny appropriate in a content-based restriction analysis is fundamentally a First Amendment issue.

cerned about whether the restricted speech was harmful or offensive to listeners such that its suppression was justified. Rather, the basis for invalidating the ordinance was its underinclusive character. The Court held that by limiting the voices that could be heard at the stairs of the school door to those involved in a labor dispute, the government was deciding what information was of value to the American people. This, the Court concluded, was a content-based determination which is impermissible under the First Amendment. As one commentator has suggested, the key issue in *Mosley* "is whether the government may constitutionally restrict *only* the speech restricted." Stone, *Content Regulation and the First Amendment* 25 Wm. & Mary L.Rev. 189, 203 (1983); *see also Erznoznik v. Jacksonville*, 422 U.S. 205, 208–12, 95 S.Ct. 2268, 2272–74, 45 L.Ed.2d 125 (1975); *Widmar v. Vincent*, 454 U.S. 263, 267–77, 102 S.Ct. 269, 273–78, 70 L.Ed.2d 440 (1981).

The right of the press to be free from regulations that are discriminatory on their face or as applied, however, is not synonymous with a guaranteed right to gather news at all times and places or in any manner that may be desired. *See Heffron v. International Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647–48, 101 S.Ct. 2559, 2563–64, 69 L.Ed.2d 298 (1981); *Cox v. Louisiana*, 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965). The activities of the press are subject to reasonable time, place, and manner restrictions. *Grayned v. Rockford*, 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972); *Cox*, 379 U.S. at 558, 85 S.Ct. at 466. In reviewing regulations, such as those that are written by DOD for use in a military operation, the Court would inquire whether they are "justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in doing so they leave open ample alternative channels for communication of the information." *Heffron*, 452 U.S. at 648, 101 S.Ct. at 2564.

There is little disagreement, even from plaintiffs, that DOD may place reasonable time, place, and manner restrictions on the press upon showing that there is a significant governmental interest.[15] Yet, when asked at oral argument about how the government may design appropriate non-content based regulations that had reasonable time, place, and manner restrictions, counsel for the NATION responded, "Fortunately, I don't have to make that decision." Transcript, March 7, 1991, at p. 46. When the Court posed a hypothetical involving an amphibious landing in a foreign land which assumed the presence of more press representatives than boats to accommodate them, counsel for the NATION had no suggestion on how to decide which members of the media should be included. Instead, arguing that no limitations whatsoever should apply, he explained, "I dare say that if NBC rented [a luxury private yacht] ... it doesn't impede the [amphibious] military operation." Transcript, March 7, 1991, at p. 53.

Of course plaintiffs' espousal of the view that any journalist wishing access to a battlefield may have such access avoids the necessity to provide for some selection process when either logistics or security concerns may mandate limitation of the number of journalists who may be present. But surely a court ruling on the possible appropriateness of such a restriction for some future military conflict must consider the possibility that at times such circumstances may be present. Who can say that during the next American overseas military operation some restriction on the number of journalists granted access at a particular time to a particular battlefield may not be a reasonable time, place, and manner restriction? Who today can even predict the manner in which the next war may be fought?[16]

**15.** When the NATION plaintiffs argued that "pooling which restricts the access of press members who want access to an open event is a prior restraint," the Court inquired whether that statement was "subject to reasonable time, place, and manner restrictions?" In response, plaintiffs' counsel correctly responded "Yes, that is the law." *See* transcript, March 7, 1991, at 15.

**16.** Plaintiffs contend that the Court should recognize the right of the press to unrestricted access, and hold, as a matter of constitutional

The Court, repeatedly and unsuccessfully, pressed plaintiffs to propose specific alternatives to the DOD regulations that the press believed would pass constitutional scrutiny. Except for AFP, whose request for relief is specific but moot (*i.e.* that it be admitted to the photo pool), plaintiffs' only response was that the press be allowed unlimited unilateral access. Although specifically alerted at an early pretrial conference [17] to the Court's concern about the lack of specificity in the NATION plaintiffs' prayer for relief in the original complaint, and that the Court would carefully scrutinize the then-anticipated amended complaint for proposed specific remedial measures, the amended complaint still lacks specificity. Rather than make specific proposals, such as suggesting that any regulations must include provisions for a speedy administrative review process for those who claim they were improperly excluded from a pool, plaintiffs have adhered to an absolute "no limitation" approach.

In a case of such moment, involving significant and novel constitutional doctrines, the Court must have the benefit of a well focused controversy. *See Army Rescue,* 331 U.S. at 584, 67 S.Ct. at 1427. The Court should not now be evaluating a set of regulations that are currently being reviewed for probable revision, to determine their reasonableness in the context of a conflict that does not exist and the precise contours of which are unknown and unknowable. For these reasons, the Court declines to grant plaintiffs' application for declaratory relief on their First and Fifth Amendment equal access claims.

## CONCLUSION

In the Court's view, the right of access claims, and particularly the equal access claims, are not sufficiently in focus at this time to meet the *Rescue Army* requirement that "the underlying constitutional

issues [be presented] in a clean-cut and concrete form." *See* 331 U.S. at 584, 67 S.Ct. at 1427. For the reasons articulated throughout the Opinion, prudence dictates that a final determination of the important constitutional issues at stake be left for another day when the controversy is more sharply focused. Accordingly, the complaint is dismissed.

SO ORDERED.

### APPENDIX A

### 7 JAN 91

### GUIDELINES FOR NEWS MEDIA

News media personnel must carry and support any personal and professional gear they take with them, including protective cases for professional equipment, batteries, cables, converters, etc.

Night Operations—Light discipline restrictions will be followed. The only approved light source is a flashlight with a red lens. No visible light source, including flash or television lights, will be used when operating with forces at night unless specifically approved by the on-scene commander.

You must remain with your military escort at all times, until released, and follow their instructions regarding your activities. These instructions are not intended to hinder your reporting. They are intended to facilitate movement, ensure safety, and protect operational security.

For news media personnel participating in designated CENTCOM Media Pools:

(1) Upon registering with the JIB, news media should contact their respective pool coordinator for explanation of pool operations.

(2) If you are unable to withstand the rigorous conditions required to operate with the forward-deployed forces, you will be medically evacuated out of the area.

---

law, that DOD follow only those guidelines used during the Vietnam War. If there is a certain lesson that Desert Storm has taught us, it is that the nature of warfare has changed radically as a result of new technology. There is little similarity between the Vietnam War and Desert Storm.

The traditional battlefield of the two World Wars and of Vietnam may be a phenomenon of the past.

**17.** *See* transcript, January 28, 1991, at p. 16–17.

(3) Security at the source will be the policy. In the event of hostilities, pool products will be subject to security review prior to release to determine if they contain information that would jeopardize an operation of the security of U.S. or coalition forces. Material will not be withheld just because it is embarrassing or contains criticism. The public affairs officer on the scene will conduct the security review. However, if a conflict arises, the product will be expeditiously sent to JIB Dhahran for review by the JIB Director. If no agreement can be reached, the product will be expeditiously forwarded to OASD(PA) for review with the appropriate bureau chief.

Casualty information, because of concern of the notification of the next of kin, is extremely sensitive. By executive directive, next of kin of all military fatalities must be notified in person by a uniformed member of the appropriate service. There have been instances in which the next of kin have first learned of the death or wounding of a loved one through the news media. The problem is particularly difficult for visual media. Casualty photographs showing a recognizable face, name tag, or other identifying feature or item should not be used before the next of kin have been notified. The anguish that sudden recognition at home can cause far outweighs the news value of the photograph, film or videotape. Names of casualties whose next of kin have been notified can be verified through the JIB Dhahran.

## APPENDIX B

### 10 JAN 91

## GUIDELINES FOR NEWS MEDIA

News media personnel must carry and support any personal and professional gear they take with them, including protective cases for professional equipment, batteries, cables, converters, etc.

Night Operations—Light discipline restrictions will be followed. The only approved light source is a flashlight with a red lens. No visible light source, including flash or television lights, will be used when operating with forces at night unless specifically approved by the on-scene commander.

You must remain with your military escort at all times, until released, and follow their instructions regarding your activities. These instructions are not intended to hinder your reporting. They are intended to facilitate movement, ensure safety, and protect operational security.

For news media personnel participating in designated CENTCOM Media Pools:

(1) Upon registering with the JIB, news media should contact their respective pool coordinator for explanation of pool operations.

(2) If you are unable to withstand the rigorous conditions required to operate with the forward-deployed forces, you will be medically evacuated out of the area.

(3) Security at the source will be the policy. In the event of hostilities, pool products will be subject to security review prior to release to determine if they contain information that would jeopardize an operation or the security of U.S. or coalition forces. Material will not be withheld just because it is embarrassing or contains criticism. The public affairs officer on the scene will conduct the security review. However, if a conflict arises, the product will be expeditiously sent to JIB Dhahran for review by the JIB Director. If no agreement can be reached, the product will be expeditiously forwarded to OASD(PA) for review with the appropriate bureau chief.

(4) Correspondents may not carry a personal weapon.

Casualty information, because of concern of the notification of the next of kin, is extremely sensitive. By executive directive, next of kin of all military fatalities must be notified in person by a uniformed member of the appropriate service. There have been instances in which the next of kin have first learned of the death or wounding of a loved one through the news media. The problem is particularly diffi-

cult for visual media. Casualty photographs showing a recognizable face, name tag, or other identifying feature or item should not be used before the next of kin have been notified. The anguish that sudden recognition at home can cause far outweighs the news value of the photograph, film or videotape. News coverage of casualties in medical centers will be in strict compliance with the instructions of doctors and medical officials.

## APPENDIX C

### 14 JAN 91

### GUIDELINES FOR NEWS MEDIA

News media personnel must carry and support any personal and professional gear they take with them, including protective cases for professional equipment, batteries, cables, converters, etc.

Night Operations—Light discipline restrictions will be followed. The only approved light source is a flashlight with a red lens. No visible light source, including flash or television lights, will be used when operating with forces at night unless specifically approved by the on-scene commander.

Because of host-nation requirements, you must stay with your public affairs escort while on Saudi bases. At other U.S. tactical or field locations and encampments, a public affairs escort may be required because of security, safety, and mission requirements as determined by the host commander.

Casualty information, because of concern of the notification of the next of kin, is extremely sensitive. By executive directive, next of kin of all military fatalities must be notified in person by a uniformed member of the appropriate service. There have been instances in which the next of kin have first learned of the death or wounding of a loved one through the news media. The problem is particularly difficult for visual media. Casualty photographs showing a recognizable face, name tag, or other identifying feature or item should not be used before the next of kin

have been notified. The anguish that sudden recognition at home can cause far outweighs the news value of the photograph, film or videotape. News coverage of casualties in medical centers will be in strict compliance with the instructions of doctors and medical officials.

To the extent that individuals in the news media seek access to the U.S. area of operation, the following rule applies: Prior to or upon commencement of hostilities, media pools will be established to provide initial combat coverage of U.S. forces. U.S. news media personnel present in Saudi Arabia will be given the opportunity to join CENTCOM media pools, providing they agree to pool their products. News media personnel who are not members of the official CENTCOM media pools will not be permitted into forward areas. Reporters are strongly discouraged from attempting to link up on their own with combat units. U.S. commanders will maintain extremely tight security throughout the operational area and will exclude from the area of operation all unauthorized individuals.

For news media personnel participating in designated CENTCOM Media Pools:

(1) Upon registering with the JIB, news media should contact their respective pool coordinator for an explanation of pool operations.

(2) In the event of hostilities, pool products will be the subject to review before release to determine if they contain sensitive information about military plans, capabilities, operations, or vulnerabilities (see attached ground rules) that would jeopardize the outcome of an operation or the safety of U.S. or coalition forces. Material will be examined solely for its conformance to the attached ground rules, not for its potential to express criticism or cause embarrassment. The public affairs escort officer on scene will review pool reports, discuss ground rule problems with the reporter, and in the limited circumstances when no agreement can be reached with a reporter about disputed materials, immediately send the disputed materials to JIB Dhahran for review by the JIB Director and the appropriate news media represent-

ative. If no agreement can be reached, the issue will be immediately forwarded to OASD(PA) for review with the appropriate bureau chief. The ultimate decision on publication will be made by the originating reporter's news organization.

(3) Correspondents may not carry a personal weapon.

APPENDIX D

January 30, 1991

## CENTCOM POOL MEMBERSHIP AND OPERATING PROCEDURES

### General

The following procedures pertain to the CENTCOM news media pool concept for providing news to the widest possible American audience during the initial stages of U.S. military activities in the Arabian Gulf area. The CENTCOM pools will be drawn from news media within Saudi Arabia. Their composition and operation should not be confused with that of the Department of Defense National Media Pool. The pools are a cooperative arrangement designed to balance the media's desire for unilateral coverage with the logistics realities of the military operation, which make it impossible for every media representative to cover every activity of his or her choice, and with CENTCOM's responsibility to maintain operational security, protect the safety of the troops, and prevent interference with military operations. There is no intention to discriminate among media representatives on the basis of reporting content or viewpoint. Favoritism or disparate treatment of the media in pool operations by pool coordinators will not be tolerated. The purpose and intention of the pool concept is to get media representatives to and from the scene of military action, to get their reports back to the Joint Information Bureau—Dhahran for filing—rapidly and safely, and to permit unilateral media coverage of combat and combat-related activity as soon as possible. There will be two types of pools: eighteen-member pools for ground combat and smaller, seven-member pools for ground combat and other coverage. Pools will be formed and governed by the media organizations that are qualified to participate and will be administered through pool appointed coordinators working in conjunction with the JIB—Dhahran. The media will operate under the ground rules issued by CENTCOM on January 15, 1991.

### Pool participation

Due to logistics and space limitations, participation in the pools will be limited to media that principally serve the American public and that have had a long-term presence covering Department of Defense military operations, except for pool positions specifically designated as "Saudi" or "international." Pool positions will be divided among the following categories of media: television, radio, wire service, news magazine, newspaper, pencil, photo, Saudi, and international. Media that do not principally serve the American public are qualified to participate in the CENTCOM media pool in the international category.

### Pool procedures

Because of the extensive media presence in the Arabian Gulf, the fact that some media organizations are represented by many individuals, and the likelihood that more organizations and individuals will arrive in the future, membership in all categories except pencil will be by organization rather than specific individual. An organization will be eligible to participate in pool activities only after being a member of the appropriate media pool category for three continuous weeks. Members of a single-medium pool may use their discretion to allow participation by organizations which have had a significant stay in country, but which have had breaks in their stay that would otherwise cause them to be ineligible to participate under the three-continuous-weeks rule.

The single-medium pools will be formed and governed by the members. The members of each category will appoint a pool coordinator who will serve as the spokes-

person and single point of contact for that medium. The print media will select a coordinator who will serve as the point of contact for the pencil category. Any disputes about membership in or operation of the pool shall be resolved by the pool coordinator.

Each single-medium pool coordinator will maintain a current list of members and a waiting list prioritized in the order in which they should be placed on the pools. The same order will be used to replace pool members during normal rotations and those individual members who return from the field prematurely and who do not have another individual in Dhahran from their organization to replace them.

Membership of standing pools will rotate approximately every two to three weeks as the situation permits.

Pool categories and composition:

*Television:* The television category will be open to the major television networks.

*Radio:* The radio category will be open to those radio networks that serve a general (nonprivate) listening audience.

*Wire Service:* The wire service category will be open to the major wire services.

*News Magazine:* The news magazine category will be open to those major national news magazines that serve a general news function.

*Newspaper:* The newspaper category will be divided into two subcategories for participation in the eighteen-member pools. One will be open to those major papers and newspaper groups that have made a commitment since the early stages of Operation Desert Shield to cover U.S. military activities in Saudi Arabia and which have had a continuous or near-continuous presence in Saudi Arabia since the early stages of the operation, such as the *New York Times,* Cox, Knight–Ridder, *Wall Street Journal, Chicago Tribune, Los Angeles Times, Washington Post, USA Today,* and *Boston Globe.* The second category will include all other newspapers.

*Pencil:* The general category of "pencil" (print reporter) may be used by the print media pool coordinator in assigning print reporters to the smaller pools. All eligible print reporters may participate.

*Photo:* The photography category will be divided into the four subcategories of wire, newspaper, magazine, and photo agency. Participants may take part in only one subcategory.

*Saudi:* The Saudi category will be open to Saudi reporters as determined by the Saudi Ministry of Information liaison in the JIB—Dhahran. They must speak and write English and must file their reports in English.

*International:* The international category will be open to reporters from organizations which do not principally serve the American public from any news medium. They must speak and write English and must file their reports in English.

## SHARING OF MEDIA PRODUCTS WITHIN THE CENTCOM POOLS

Pool participants and media organizations eligible to participate in the pools will share all media products within their medium; e.g., television products will be shared by all other television pool members and photo products will be shared with other photo pool members. The procedures for sharing those products and the operating expenses of the pool will be determined by the participants of each medium.

Alert Procedures for Combat Correspondent Pool Activation

When the pools are to be activated, the JIB–Dhahran director or his designated representative will call each of the pool coordinators and announce the activation of the pools. The pool coordinators will be told when and where the pool members are to report (the reporting time will be within—but not later than—two hours of alert notification).

Operational security (OPSEC) considerations are of the utmost concern. JIB personnel, pool coordinators, and pool members need to be especially cognizant of OPSEC. All involved with the activation of the pools need to remain calm and unexcit-

ed. Voice inflection, nervous behavior, etc., are all indicators that something extraordinary is underway and could signal that operations are imminent.

Neither pool coordinators nor pool members will be told if the activation is an "exercise" or actual "alert".

Pool members should report to the predesignated assembly area dressed for deployment, with the appropriate equipment and supplies.

Recommendations for changes to pool membership or other procedures will be considered on a case-by-case basis.

APPENDIX E

7 JAN 91

## OPERATION DESERT SHIELD GROUND RULES

The following information should not be reported because its publication or broadcast could jeopardize operations and endanger lives:

(1) For U.S. or coalition units, specific numerical information on troop strength, aircraft, weapons systems, on-hand equipment, or supplies (e.g. artillery, tanks, radars, missiles, trucks, water), including amounts of ammunition or fuel moved by support units or on hand in combat units. Unit size may be described in general terms such as "company-size," "multi-battalion," "multi-division," "naval task force," and "carrier battle group." Number or amount of equipment and supplies may be described in general terms such as "large," "small," or "many."

(2) Any information that reveals details of future plans, operations, or strikes, including postponed or cancelled operations.

(3) Information or photography, including aerial and satellite pictures, that would reveal the specific location of military forces or show the level of security at military installations or encampments. Locations may be described as follows: all Navy embark stories can identify the ship upon which embarked as a dateline and will state that the report is coming "from the Persian Gulf," "Red Sea," or "North Arabian Sea." Stories written in Saudi Arabia may be datelined, "Eastern Saudi Arabia," "Near the Kuwaiti border," etc. For specific countries outside Saudi Arabia, stories will state that the report is coming from the Persian Gulf region unless DOD has publicly acknowledged participation by that country.

(4) Rules of engagement details.

(5) Information on intelligence collection activities, including targets, methods, and results.

(6) During an operation, specific information on friendly force troop movements, tactical deployments, and dispositions that would jeopardize operational security and lives. This would include unit designations, names of operations, and size of friendly forces involved, until released by CENTCOM.

(7) Identification of mission aircraft points of origin, other than as land or carrier based.

(8) Information on the effectiveness or ineffectiveness of enemy camouflage, cover, deception, targeting, direct and indirect fire, intelligence collection, or security measures.

(9) Specific identifying information on missing or downed aircraft or ships while search and rescue operations are planned or underway.

(10) Special operations forces' methods, unique equipment or tactics.

(11) Specific operating methods and tactics, (e.g., air ops angles of attack or speeds, or naval tactics and evasive maneuvers). General terms such as "low" or "fast" may be used.

(12) Information on operational or support vulnerabilities that could be used against U.S. forces, such as details of major battle damage or major personnel losses of specific U.S. or coalition units, until that information no longer provides tactical advantage to the enemy and is, therefore, released by CENTCOM. Damage and casualties may be described as "light," "moderate," or "heavy."

13 JAN 91

## OPERATION DESERT SHIELD GROUND RULES

The following information should not be reported because its publication or broadcast could jeopardize operations and endanger lives:

(1) For U.S. or coalition units, specific numerical information on troop strength, aircraft, weapons systems, on-hand equipment, or supplies (e.g. artillery, tanks, radars, missiles, trucks, water), including amounts of ammunition or fuel moved by support units or on hand in combat units. Unit size may be described in general terms such as "company-size," "multi-battalion," "multi-division," "naval task force," and "carrier battle group." Number or amount of equipment and supplies may be described in general terms such as "large," "small," or "many."

(2) Any information that reveals details of future plans, operations, or strikes, including postponed or cancelled operations.

(3) Information, photography, and imagery that would reveal the specific location of military forces or show the level of security at military installations or encampments. Locations may be described as follows: all Navy embark stories can identify the ship upon which embarked as a dateline and will state that the report is coming "from the Persian Gulf," "Red Sea," or "North Arabian Sea." Stories written in Saudi Arabia may be datelined, "Eastern Saudi Arabia," "Near the Kuwaiti border," etc. For specific countries outside Saudi Arabia, stories will state that the report is coming from the Persian Gulf region unless that country has acknowledged its participation.

(4) Rules of engagement details.

(5) Information on intelligence collection activities, including targets, methods, and results.

(6) During an operation, specific information on friendly force troop movements, tactical deployments, and dispositions that would jeopardize operational security and

lives. This would include unit designations, names of operations, and size of friendly forces involved, until released by CENTCOM.

(7) Identification of mission aircraft points of origin, other than as land or carrier based.

(8) Information on the effectiveness or ineffectiveness of enemy camouflage, cover, deception, targeting, direct and indirect fire, intelligence collection, or security measures.

(9) Specific identifying information on missing or downed aircraft or ships while search and rescue operations are planned or underway.

(10) Special operations forces' methods, unique equipment or tactics.

(11) Specific operating methods and tactics (e.g., air ops angles of attack or speeds, or naval tactics and evasive maneuvers). General terms such as "low" or "fast" may be used.

(12) Information on operational or support vulnerabilities that could be used against U.S. forces, such as details of major battle damage or major personnel losses of specific U.S. or coalition units, until that information no longer provides tactical advantage to the enemy and is, therefore, released by CENTCOM. Damage and casualties may be described as "light," "moderate," or "heavy."

14 JAN 91

## OPERATION DESERT SHIELD GROUND RULES

The following information should not be reported because its publication or broadcast could jeopardize operations and endanger lives:

(1) For U.S. or coalition units, specific numerical information on troop strength, aircraft, weapons systems, on-hand equipment, or supplies (e.g., artillery, tanks, radars, missiles, trucks, water), including amounts of ammunition or fuel moved by or on hand in support and combat units. Unit size may be described in general terms such as "company-size," "multi-battalion," "multi-division," "naval task

force," and "carrier battle group." Number or amount of equipment and supplies may be described in general terms such as "large," "small," or "many."

(2) Any information that reveals details of future plans, operations, or strikes, including postponed or cancelled operations.

(3) Information, photography, and imagery that would reveal the specific location of military forces or show the level of security at military installations or encampments. Locations may be described as follows: all Navy embark stories can identify the ship upon which embarked as a dateline and will state that the report is coming from the "Persian Gulf," "Red Sea," or "North Arabian Sea." Stories written in Saudi Arabia may be datelined "Eastern Saudi Arabia," "Near the Kuwaiti border," etc. For specific countries outside Saudi Arabia, stories will state that the report is coming from the Persian Gulf region unless that country has acknowledged its participation.

(4) Rules of engagement details.

(5) Information on intelligence collection activities, including targets, methods, and results.

(6) During an operation, specific information on friendly force troop movements, tactical deployments, and dispositions that would jeopardize operational security or lives. This would include unit designations, names of operations, and size of friendly forces involved, until released by CENTCOM.

(7) Identification of mission aircraft points of origin, other than as land- or carrier-based.

(8) Information on the effectiveness or ineffectiveness of enemy camouflage, cover, deception, targeting, direct and indirect fire, intelligence collection, or security measures.

(9) Specific identifying information on missing or downed aircraft or ships while search and rescue operations are planned or underway.

(10) Special operations forces' methods, unique equipment or tactics.

(11) Specific operating methods and tactics (e.g., air ops angles of attack or speeds, or naval tactics and evasive maneuvers). General terms such as "low" or "fast" may be used.

(12) Information on operational or support vulnerabilities that could be used against U.S. forces, such as details of major battle damage or major personnel losses of specific U.S. or coalition units, until that information no longer provides tactical advantage to the enemy and is, therefore, released by CENTCOM. Damage and casualties may be described as "light," "moderate," or "heavy."