# Restrictions on Travel by Voice of America Correspondents

The Secretary of State and Chiefs of Mission may restrict travel by Voice of America correspondents in foreign countries in order to protect their safety, but only under conditions ensuring, to the greatest extent possible, the independence of VOA correspondents.

September 10, 1999

MEMORANDUM OPINION FOR THE DEPUTY LEGAL ADVISER
DEPARTMENT OF STATE

You have asked for our opinion whether the Secretary of State and Chiefs of Mission may restrict, on grounds of safety, official travel in foreign countries by Voice of America ("VOA") correspondents. We conclude that the Secretary of State and Chiefs of Mission may impose such restrictions, but only under conditions ensuring, to the greatest extent possible, the independence of VOA correspondents.

I.

The VOA, which broadcasts radio programs to foreign audiences in English and foreign languages, is part of the International Broadcasting Bureau of the United States Information Agency ("USIA"). *See* National Archives and Records Administration, *United States Government Manual 1998/99*, at 696 (1998). It operates under the supervision of the Broadcasting Board of Governors ("BBG"), which is also within the USIA and consists of eight members appointed by the President with the Senate's advice and consent, plus the USIA Director. 22 U.S.C. §§ 6203(b) & 6204(a)(1) (1994). Under the "VOA Charter," as enacted into law, VOA news broadcasts are to be "consistently reliable and authoritative" and "accurate, objective, and comprehensive," to "present a balanced and comprehensive projection of significant American thought and institutions," and to "present the policies of the United States clearly and effectively, and . . . also present responsible discussions and opinions on these policies." *Id.* § 6202(c)(1)–(3) (1994). Although VOA is part of the United States Government, Congress has established some protection for its independence: "The Director of the United States Information Agency and the [BBG], in carrying out their functions, shall respect *the professional independence and integrity* of the International Broadcasting Bureau, *its broadcasting services*, and the grantees." *Id.* § 6204(c) (emphasis added). The creation of the BBG offered an additional safeguard against political control of broadcast content. As the President stated, the BBG "will ensure independence, coherence, quality and journalistic integrity" in services such as VOA. *Statement on International Broadcasting Programs*, 1 Pub. Papers of William J. Clinton 857–58 (1993).

192

Congress was specifically concerned about the extent to which the Department of State might interfere with the VOA's judgments about reporting. Although the International Broadcasting Act declares that the Secretary of State, acting through the Director of USIA, is to "provide information and guidance on foreign policy issues to the [BBG]," 22 U.S.C. § 6205 (1994), the legislative history makes clear that, in keeping with the need for independence, this is to be the exclusive channel for such guidance, H.R. Conf. Rep. No. 103–482, at 202 (1994), *reprinted in* 1994 U.S.C.C.A.N. 398, 443, and the Secretary of State is not to be "involved in the management or day-to-day decision-making of the [USIA] or any of its operations or programs such as international broadcasting or otherwise." S. Rep. No. 103–107, at 49 (1994).

A statute enacted earlier, the Diplomatic Security Act of 1986, directs the Secretary of State to "develop and implement" measures for the "protection of all United States Government personnel on official duty abroad (other than those personnel under the command of a United States area military commander)." 22 U.S.C. § 4802(a)(1)(A) (1994). Chiefs of Mission, who carry out the instructions of the Secretary of State, have additional authority under the Foreign Service Act of 1980: the Chief of Mission in a country has "full responsibility for the direction, coordination, and supervision of all Government executive branch employees in that country," and each agency of the executive branch with employees in a foreign country "shall insure that all [of its] employees in that country . . . comply fully with all applicable directives of the chief of mission." 22 U.S.C. §§ 3927(a), (b) (1994). *See* 1 Foreign Affairs Manual 013, Exhibit 013.2 (Sept. 16, 1994) (text of President Clinton's Letter to Chiefs of Mission) ("I charge you to exercise full responsibility for the direction, coordination, and supervision of all executive branch offices and personnel in [country] . . . except for personnel under the command of a U.S. area military commander, under another chief of mission in [country], or on the staff of an international organization."); *see also* 1 Foreign Affairs Manual 010 (Sept. 23, 1981) (letter of Instruction from President Ronald Reagan to Ambassadors). Pursuant to these provisions, the Department of State ordinarily requires that United States Government employees seek its clearance before they enter a foreign country on official business ("country clearance").

The question here arises from the intersection of VOA's independence, which enables it to present broadcasts that are "reliable and authoritative" and "accurate, objective, and comprehensive," and the Secretary of State's authority to protect United States Government employees abroad. The State Department takes the view that the Secretary of State and the Chiefs of Mission may impose travel restrictions on VOA correspondents when necessary for their protection. *See* Letter for Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, from James H. Thessin, Deputy Legal Adviser, Department of State (June 27, 1997) ("First Thessin Letter"); Letter for Dawn E. Johnsen,

Acting Assistant Attorney General, Office of Legal Counsel, from James H. Thessin, Deputy Legal Adviser, Department of State (Oct. 20, 1997) ("Second Thessin Letter"). The BBG, on the other hand, believes that such restrictions amount to unlawful interference with VOA's independence. Letter for Dawn Johnsen, Acting Assistant Attorney General, Office of Legal Counsel, from John A. Lindburg, Legal Counsel, Broadcasting Board of Governors (July 31, 1997) ("First Lindburg Letter"); Letter for Dawn Johnsen, Acting Assistant Attorney General, Office of Legal Counsel, from John A. Lindburg, Legal Counsel, Broadcasting Board of Governors (Sept. 19, 1997) ("Second Lindburg Letter").

It has long been recognized that, at least as a matter of policy, the Department of State should limit its control over travel by VOA correspondents. In 1978 the State Department issued Guidelines and Operating Procedures for VOA's Foreign Correspondents. *Guidelines and Operating Procedures for VOA's Foreign Correspondents* (1978) ("Guidelines"). In addition to protecting the reportorial independence of VOA correspondents, the Guidelines left the State Department only a relatively narrow authority to restrict VOA correspondents' travel. These correspondents were not subject to "country clearance" by the State Department. Instead, the Guidelines declared that "[t]he VOA correspondent has a general obligation to inform the [State Department] of his/her presence in the country, and of the general nature of his or her assignment(s)." *Id.* at 3. Moreover, "should a story require travel in a war zone or other dangerous area, VOA correspondents will consult in advance with VOA Washington and will keep the Embassy informed of their plans." *Id.*[1]

After Congress passed the Diplomatic Security Act in 1986, the State Department apparently began to take the position that VOA correspondents, while not required to obtain the usual "country-clearance," needed approval from the State Department before entering "war zones" or "dangerous areas." *See* Memorandum from James H. Thessin, Deputy Legal Adviser, Department of State, *Re: Applicability of Department of State Travel Restrictions to Voice of America Correspondents* at 3 n.1 (June 27, 1997) ("Attachment to First Thessin Letter"). On April 15, 1993, the VOA asked the State Department to "lift the restriction placed on [VOA] on sending correspondents to Afghanistan and similar locations of combat or civil strife." Letter for J. Brian Atwood, Under Secretary for Management, Department of State, from Joseph B. Bruns, Acting Associate Director for Broadcasting, VOA, at 2 (Apr. 15, 1993) ("Bruns Letter"). There appears to be a disagreement between the BBG and the State Department whether this request, in effect, acknowledged the lawfulness of the restrictions. First Lindburg Letter at 4. In any event, at the time, the State Department concluded that VOA correspond-

---

[1] Under the Guidelines, just as VOA correspondents did not have to follow procedures otherwise applicable to government employees, they did not receive some benefits that might otherwise come with government service. The Guidelines provided that they were to travel on regular, not official or diplomatic, passports, to enter countries with journalist visas, to be subject to all local laws applicable to foreign journalists; to have no access to classified information; and to use commercial, rather than United States Government, communications. Guidelines at 2.

ents would not "be excepted from restrictions that apply to all [United States Government] employees" and denied the request as a general matter, but attempted to speed up case-by-case review of individual requests to travel into Afghanistan by delegating approval authority to the United States Ambassador to Pakistan. Letter for Joseph B. Bruns, Acting Associate Director, VOA, from J. Brian Atwood, Under Secretary for Management, Department of State (May 10, 1993). The matter continues in dispute, particularly with regard to Afghanistan, and you have asked us to review the legal authority for the State Department's restrictions.

After you made this request, Congress reorganized some agencies engaged in the conduct of foreign relations, including the USIA. *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105–277, tit. XIII, 112 Stat. 2681–761, 2681–776 (1998) ("Reform and Restructuring Act"). The reorganization, insofar as is relevant here, becomes effective no later than October 1, 1999. *Id.* § 1301. At that time, the USIA will be abolished (except for the BBG and the International Broadcasting Bureau, which will remain in existence), and its functions will be transferred to the State Department. *Id.* §§ 1311–1312. Congress, however, reaffirmed that the Secretary of State is to "respect the professional independence and integrity of the International Broadcasting Bureau, its broadcasting services, and the grantees of the Board." *Id.* § 1323(i) (to be codified at 22 U.S.C. § 6204(d)).

## II.

The question here is exceptionally close and difficult. On one hand, Congress has provided for VOA's "professional independence" as a guarantee that VOA will be a "consistently reliable and authoritative source of news" and that its broadcasts will be "accurate, objective, and comprehensive." On the other hand, Congress granted the Department of State wide authority over the protection of civilian employees of the United States while abroad. If potentially conflicting statutes can co-exist, they should be read, " 'absent a clearly expressed congressional intention to the contrary,' " in a manner that treats " 'each as effective.' " *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). To explain the basis on which we believe that these statutes can be read together, we must first set out and evaluate, at some length, the arguments in favor of the outcome sought by each agency in this matter.[2]

---

[2] We cannot resolve the issue by turning to the principle that, absent a clear intention to the contrary, a specific statute controls a general one *Crawford Fitting Co v. J T Gibbons, Inc.*, 482 U S 437, 445 (1987) Although the statutes on which the State Department relies are the more specific ones on the question of safety, they are less specific on the question of VOA's freedom to report the news.

A.

There is no dispute that, in general, the Department of State may restrict federal employees' official travel abroad. The Secretary of State's authority comes from her statutory mandate to develop programs for the "protection of all United States Government personnel on official duty abroad (other than those personnel under the command of a United States area military commander)," 22 U.S.C. § 4802(a), and from the statute vesting the Chiefs of Mission, subject to the Secretary's ultimate control, with "full responsibility for the direction, coordination, and supervision of all Government executive branch employees in that country (except for employees under the command of a United States area military commander)." *Id.* § 3927. Ordinarily, therefore, a government official in Pakistan, for example, could not travel to Afghanistan on official business, if the State Department prohibited the travel on security grounds.

The BBG argues, however, that "both the U.S. International Broadcasting Act of 1994 . . . and the so-called VOA charter . . . provide a reasonable basis for exemption from the authority relied upon by the Department of State." First Lindburg Letter at 2. According to this argument, by requiring the Director of USIA and the BBG to "respect the professional independence and integrity" of VOA, 22 U.S.C. § 6204(c), and by directing that VOA broadcasts be "authoritative," "objective," and "balanced and comprehensive," *id.* § 6202(c)(1), (2), Congress placed beyond the control of the Secretary decisions about the travel that VOA correspondents might undertake to gather the news.

The BBG contends that freedom from travel restrictions cannot be separated from VOA's independence in reporting:

> It simply makes no sense to prohibit the Department of State from interfering with the content of news, and yet allow interference with the gathering of it. For this reason the Broadcasting Act requires respect of the professional "independence" as well as integrity of the broadcasters.

First Lindberg Letter at 6. According to this argument, to be a "consistently reliable and authoritative" and an "accurate, objective, and comprehensive" source of news, 22 U.S.C. § 6202(c)(1), the VOA must be able to dispatch its correspondents to those locations where the news is being made. First Lindburg Letter at 4. A limitation on news gathering is, BBG contends, a limitation on what VOA is able to report, as well as a detriment to its credibility as a news organization. *Id.* at 10–11.

In our view, travel restrictions that are not applied to all United States citizens, or even to all United States reporters,[3] are an exercise of control potentially undercutting the "professional independence" of the VOA and limiting its ability to carry out its statutory duty to present "authoritative" and "comprehensive" news broadcasts. Without a correspondent in a country, VOA could not even confirm for itself, let alone ascertain, the local conditions. *See e.g.*, Chalmers M. Roberts, *The Washington Post: The First 100 Years* 373 (1977) ("THE POST deserved criticism for its delay in covering the Vietnam War. Not until mid-1964, long after the New York *Times*, did the THE POST open a Saigon bureau."). Nor could it obtain face-to-face interviews with local leaders or develop sources outside official channels. *See e.g.*, A.M. Rosenthal, *How It Felt to Be Kicked Out of Poland, in The Working Press* 161,164 (Ruth Adler ed., 1970) (1966) (describing protection of sources by reporter living in totalitarian country). To give a specific example, it would have been hard to credit a broadcast news organization that claimed to be reporting "authoritative[ly]" and "comprehensive[ly]" on the unification of Germany if its correspondents did not at least have the opportunity to speak to Germans outside official channels.

Travel restrictions limit the range of what VOA can report and thus may intrude on its "professional independence." Its reports cannot be "authoritative" if they are second-hand and cannot be "comprehensive" if they exclude on-the-ground news gathering. The same statutory language that guarantees VOA's freedom in selecting the content of its broadcasts also protects its freedom in gathering the news.[4]

"Fresh news," Justice Holmes wrote, "is got only by enterprise and expense." *International News Serv. v. Associated Press*, 248 U.S. 215, 247 (1918) (separate opinion) ("*INS*"). As the Court recognized in *INS*, news organizations may be free to rely on each other's reports to point toward the stories that need to be reported, but the means for gathering the news — the "elaborate organization" and the "money, skill, and effort" that allow for "novelty and freshness, the regularity of the service, its reputed reliability and thoroughness, and its adaptability to the public needs" — are a distinctive element essential to the individual voice of each provider of news. *Id.* at 238. We believe that the VOA's statutory protection is best read to offer substantial protection to the kind of news gathering at issue here, along with the ultimate content of the VOA's broadcasts that this news gathering does so much to shape.

---

[3] We do not address the government's ability to limit the access of all media during hostilities, for example, *cf The Nation Magazine v United States Dep't of Defense*, 762 F. Supp. 1558 (S D.N Y 1991) (raising claims about limitations on access during Persian Gulf War), or the government's authority to impose travel or other restrictions on United States citizens generally

[4] Furthermore, when carrying out its duty to offer "programming to meet needs which remain unserved by the totality of media voices available to the people of certain nations," 22 U.S.C. § 6202(b)(4) (1994), the VOA necessarily will be the only news organization reporting fully within those nations on the subjects of its stories In such circumstances, it is all the more important for the VOA to be able to offer first-hand coverage

This interpretation is consistent with the view that President Carter took in transmitting to Congress Reorganization Plan No. 2 in 1977, which he said aimed at "[k]eeping the . . . *news gathering* and reporting functions [of VOA] independent and objective." S. Rep. No. 95–606, at 81 (1977) (emphasis added). It is also consistent with the legislative history of recent amendments that will abolish the USIA. There, too, Congress took the view that the statutory safeguard of "professional independence" extends to news gathering as well as reporting. Recognizing that the Secretary of State would take over functions of the Director of USIA, Congress replaced the reference to the Director with one to the Secretary in the provision directing "respect [for] the professional independence and integrity" of the broadcasting services like the VOA. Reform and Restructuring Act, § 1323(i) (to be codified at 22 U.S.C. § 6204(d)). The relevant committee report states:

> Although the [BBG] will be a federal agency, the work performed by the international broadcasting entities under it can hardly be described as a typical government function. Cynics may deride their work as "propaganda," but in fact the broadcasters are journalists, reporting the news of the United States and the world to foreign audiences. The *news gathering* and reporting functions of the broadcasters must continue to be *independent* and objective.

H.R. Conf. Rep. No. 105–432, at 127 (1998) (emphasis added).[5] Whatever weight this committee report deserves,[6] it is consistent with the conclusion that news gathering, as well as reporting, is entitled to protection.

Even if news gathering is entitled to protection, however, there are strong arguments for the State Department's authority to impose at least some limitations on travel by VOA correspondents. Because the Diplomatic Security Act requires the Secretary to "develop and implement" measures for the "protection of all United States Government personnel on official duty abroad (other than those personnel under the command of a United States area military commander)," 22 U.S.C. § 4802(a)(1)(A), the Secretary's inability to exercise any control over travel by VOA correspondents would conflict with the statutory assignment of responsi-

---

[5] This committee report addressed H.R. 1757, rather than H.R 4328, the bill actually enacted; but the Chairman of the committee with jurisdiction over H R. 1757, in "apprising the House and the public concerning the legislative history" of the relevant "Division" in H R. 4328, noted that "Division G consists — with but minor changes — of Divisions A and B of the Conference Report on H.R 1757 of the 105th Congress, House Report 105-432 " 144 Cong Rec. H11,667 (daily ed. Oct 20, 1998) (statement of Rep Gilman).

[6] Insofar as the committee report deals with the existing law ("must *continue* to be independent and objective"), it might be dismissed as a statement about the action of an earlier Congress *See Consumer Product Safety Comm'n v. GTE Sylvania, Inc*, 447 U.S 102, 117–18 & n.13 (1980). Insofar as it deals with a new statute possibly intended only to maintain existing law, the legislative history might also be dismissed as an attempt to go beyond a legislative, and to assume an interpretive, function *See Pierce v. Underwood*, 487 U S. 552, 566–67 (1988). Still, the committee report may carry some degree of authority, since Congress did not just reenact but amended the earlier language and since the language echoed President Carter's words.

bility for the safety of *all* federal employees abroad with the *sole* exception of those under military command. The authority to "develop and implement" measures for the protection of VOA correspondents must entail an authority to impose *effective* measures, including when the State Department believes that the only effective measure is a travel restriction.

The State Department's authority is reinforced by the letter of instructions that the President sends to all Chiefs of Mission. This letter directs Chiefs of Mission to "protect all U.S. Government personnel on official duty abroad (other than those personnel under the command of a U.S. military commander)." 1 Foreign Affairs Manual 013, Exhibit 013.2, at 3. Moreover, shortly after enactment of the Foreign Service Act of 1980, President Reagan issued letters of instruction stating that the Secretary of State "has the responsibility . . . to the fullest extent provided by law, for the overall policy direction, coordination, and supervision of the United States Government activities overseas." 1 Foreign Affairs Manual 010, at 3. Congress endorsed this assignment of responsibilities in the Diplomatic Security Act of 1986. *See* Second Thessin Letter at 2; 1 Foreign Affairs Manual 010. While we understand all of these directions to incorporate the concept that President Reagan's letter made explicit — that the State Department has the authority "to the fullest extent provided by law" and thus subject to legal constraints that may be imposed by the statutory grant of VOA's "independence" in presenting "authoritative" and "comprehensive" broadcasts — the letter of instructions calls for an interpretation that gives substantial effect to the State Department's broad control over *all* United States personnel abroad.[7]

Furthermore, although the International Broadcasting Act protects VOA's "independence," the statute plainly does not use that term in the same sense in which it would apply to news organizations not affiliated with the United States Government. VOA's activities, for example, must "be consistent with the broad foreign policy objectives of the United States," may not "duplicate the activities of private United States broadcasters" or of "government supported broadcasting entities of other democratic nations," and must present "programming to meet [the] needs which remain unserved by the totality of media voices available to the people of certain nations." 22 U.S.C. §§ 6202(a)(1), (3), (4) & (b)(4). Private broadcasters would be under no such limits in choosing stories. Thus, VOA's "independence," far from being absolute, does not match the independence of news organizations in the United States.

---

[7] In the year before passage of the International Broadcasting Act, VOA acknowledged that "[r]ules established in the Department [of State] several years ago *require* any VOA correspondent to obtain cabled permission from the Bureau of South Asian Affairs for . . travel" to Afghanistan and asked the State Department to "lift the restriction" as to that country and similar scenes of conflict. Bruns Letter at 1, 2 (emphasis added) Thus, the VOA arguably conceded the State Department's authority. Attachment to First Thessin Letter at 3 n.1. We are reluctant to read the letter as a concession, however, because it does not address the legal basis for the travel restrictions. Indeed, the letter could be no more than a statement of fact about the State Department's rules, rather than a concession about the validity of those restrictions.

Finally, the International Broadcasting Act, which provides for the VOA's "professional independence and integrity" and which, as amended, now sets out the VOA charter, states that

> [t]he provisions of, and authorities contained in or transferred pursuant to, this chapter are not intended to repeal, limit, or otherwise derogate from the authorities or functions . . . available to . . . the Secretary of State under law, reorganization plan, or otherwise, unless such provision hereof —
>
> (A) specifically refers to the provision of law or authority existing on the effective date of this chapter, so affected; or
>
> (B) *is in direct conflict with such law or authority existing on the effective date of this chapter.*

22 U.S.C. § 6209(f)(7) (1994) (emphasis added).[8] This provision "ensure[s] that no legal authorities available to . . . the Secretary of State on the date of enactment of the Act are inadvertently repealed, modified, or otherwise adversely affected." S. Rep. No. 103–107, at 53, *reprinted in* 1994 *U.S.C.C.A.N.* at 360. By stating that the Secretary's authorities are preserved except in cases of direct conflict, the statute indicates that the State Department may impose incidental and indirect burdens on VOA's activities. Only a direct intrusion on VOA's "professional independence" is ruled out.

### B.

Our task is to give effect to both the VOA's "independence" and the State Department's authority for the safety of "all" civilian employees of the United States Government while abroad. If we were to conclude that the State Department could never forbid VOA correspondents from entering dangerous areas, we would deny effect to the State Department's authority. At the same time, unless the exercise of that authority is tightly constrained, the statutory mandate "to respect the professional independence and integrity" of the VOA will not be observed. We conclude, therefore, that the Department of State may restrict travel by VOA correspondents on grounds of safety, but only if in doing so it "respect[s] the [VOA's] professional independence and integrity" to the greatest extent possible. We believe that we can identify standards to give practical application to this conclusion.

The State Department may act only in order to protect VOA's correspondents from physical danger. Because decisions about sending a correspondent to the

---

[8] This provision is repealed as of October 1, 1999. Pub. L. No. 105–277, § 1323(l)(2), 112 Stat. 2681–780 (1998).

place where a story is unfolding can profoundly affect a news organization's capacity to cover the story "authoritative[ly]" and "comprehensive[ly]," the VOA's "independence" means that the State Department may not make any judgments about the importance of a story or the need for a VOA correspondent to be in a particular location to cover it.

This principle suggests a strong presumption that the State Department may not bar VOA correspondents from entering an area to which any other United States Government employees may travel, absent a threat specifically directed against the VOA correspondents.[9] Any other rule would require the State Department to balance the danger to VOA correspondents against the value of their reporting. Such case-by-case balancing would intrude upon the core of VOA's editorial control over its broadcasts, by allowing the Department of State to make its own editorial judgments about the importance of particular stories or particular information. It would insert the Department of State directly into news decisions.

The presumption against barring VOA correspondents from areas to which any other employees may go could be overcome only for the most compelling reasons. For example, if the only United States Government employees who enter a country are accompanied by bodyguards (a precaution that could not be extended to VOA correspondents), there likely would be a substantial reason for distinguishing between the employees permitted to enter and VOA correspondents. But the presumption could not be set aside without some such compelling ground.

Our conclusion, therefore, recognizes the State Department's authority for the safety of all civilian employees of the government while abroad, but acknowledges that the authority may not be exercised where it would directly conflict with VOA's "independence," as that term is used in the statute. The State Department may not substitute itself for the VOA in making news judgments. By treating VOA correspondents (as to travel restrictions) on an equal footing with the most favorably treated employees of the government, absent some very compelling reason for doing otherwise, the State Department will ensure that it is not invading VOA's reportorial independence.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[9] Because the State Department lacks authority to develop or implement measures to protect the safety of "personnel under the command of a United States area military commander," 22 U S C § 4802(a)(1)(A), and because the military has a unique mission, the entry of United States military personnel under military command would not typically give rise to this presumption